# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| AMIBLU TECHNOLOGY AS | |
| VERSUS | CIVIL ACTION |
| | 22-259-SDD-RLB |
| U.S. COMPOSITE PIPE SOUTH AND KEN M. THOMPSON, LLC | |

## RULING

This Matter comes before the Court on the *Motion to Dismiss*[1] filed by Plaintiff/Defendant-in-Counterclaim, Ambilu Technology, as f/k/a Flowtite Technology ("Defendant" or "Flowtite"). Defendant/Plaintiff-in-Counterclaim, U.S. Composite Pipe South, LLC ("Plaintiff" or "USCPS"), filed an *Amended Counterclaim Complaint*.[2] Flowtite moves to dismiss the amended counterclaims. USCPS submitted an *Opposition*[3] to Flowtite's motion and Flowtite submitted a *Reply*.[4] For the reasons set forth below, Flowtite's motion will be granted in part and denied in part.

### I.   BACKGROUND AND PROCEDURAL FACTS

USCPS asserts the following allegations: USCPS is a supplier of glass fiber reinforced plastic pipes ("GRP pipes").[5] GRP pipes are used in "large-scale water and wastewater infrastructure projects."[6] Flowtite, through its predecessors, created the technology to

---

[1] Rec. Doc. No. 56.
[2] Rec. Doc. No. 52.
[3] Rec. Doc. No. 57.
[4] Rec. Doc. No. 60.
[5] Rec. Doc. No. 52, p. 1.
[6] *Id*.

manufacture GRP pipes (the "Flowtite Technology").[7] In 2007, USCPS purchased the North American business rights from Flowtite's then-parent company.[8] As part of the transaction, Flowtite and USCPS entered a license agreement (the "License Agreement"), which granted USCPS an "unlimited duration, an exclusive license. . . to have made, use (including operate and maintain), copy, display, perform, import, sell, offer to sell. . ." the Flowtite products in the United States and Canada.[9] The License Agreement also states, Flowtite "shall promptly disclose and convey to [USCPS] all the Know-How[10] which has been developed or acquired by [Flowtite] during the Period of Royalty Payments."[11] During this Period of Royalty Payments, USCPS paid Flowtite 2.5 percent of the net sales of the Flowtite products sold by USCPS. USCPS is one of the leading suppliers of GRP pipes in the United States.[12] Its competitor, Hobas USA, also produces and distributes GRP pipes, but using Hobas Technology.[13] USCPS "historically" held 15 to 20 percent of the GRP pipe market and Hobas USA has held 60 to 80 percent.[14] In 2017, the parent companies of Flowtite and Hobas USA merged and created a joint venture, Ambilu Holding, Gmbh ("Ambilu Holdings").[15] USCPS contends that following this merger, Ambilu Holdings entered the markets where Flowtite Technology was used to "promote[sic] and

---

[7] *Id*. at p. 7.
[8] *Id*. at p. 4. The Court notes that in USCPS' Opposition, it claims that it purchased the rights from Flowtite in 2008. Rec. Doc. No. 57, p. 10.
[9] Rec. Doc. No. 24-1, p. 65. The Court notes that the License Agreement was not filed with the moving papers, but the parties explain the Agreement was previously filed under seal and refer to it and its docket number in their moving papers.
[10] The License Agreement defines Know-How to be "all technical knowledge and data, processes, techniques, drawings and designs, unpatented inventions, operating manuals, manufacturing and quality control procedures, trade secrets, plans, accumulated experience, and other know-how of any kind relating to the design, manufacture, application, of the Products developed or obtained by Flowtite or to the maintenance operation and turning of the machinery used by [USCPS]." *Id.* at p. 64.
[11] *Id*. at p. 65.
[12] Rec. Doc. No. 52, p. 1.
[13] *Id.* at p. 2.
[14] *Id.* at p. 13.
[15] *Id*. at p. 14.

market[sic] the Hobas and Flowtite brands jointly."[16] Following the merger, Flowtite and Hobas technologies held 80 to 95 percent of the market.[17] But, because USCPS holds an exclusive license to manufacture and distribute Flowtite Technology, Ambilu Holdings is prevented from controlling the United States market.[18]

In April 2022, Flowtite filed a lawsuit in this Court seeking a declaratory judgment that the License Agreement between USCPS and Flowtite expired and is no longer in effect.[19] USCPS moved to dismiss the suit, which this Court denied.[20] USCPS contends that in addition to their efforts to terminate the agreement, Flowtite materially breached the License Agreement by refusing to "'promptly disclose and convey'. . .'all the Know-How'" to USCPS as required by the License Agreement.[21] USCPS alleges, specifically, Flowtite initially performed this disclosure and conveyance by delivering copies of the software to USCPS and did so on a recurring basis. However, Flowtite changed their performance by requiring that USCPS receive the Know-How by logging into a server.[22] USCPS alleges that although it can access the Know-How, it cannot download or copy it. The alleged breach became material when Flowtite restricted access to the Know-How in an effort to unilaterally terminate the Agreement.[23]

In June 2022, USCPS provided written notice to Flowtite with its intent to renew the Royalty Period of the License Agreement and Flowtite rejected this renewal.[24] USCPS asserts that Flowtite's actions were in an effort to exclude USCPS from the GRP pipe

---

[16] *Id*. at p. 4.
[17] *Id*. at p. 15.
[18] *Id*. at p. 5.
[19] *Id*.; Rec. Doc. No. 1.
[20] Rec. Doc. No. 36.
[21] Rec. Doc. No. 52, p. 11.
[22] *Id*. at pp. 10-11.
[23] *Id*. at p. 11, 16.
[24] *Id*. at p. 16.

market in the United States in furtherance of "consolidat[ing] a monopoly market share" amongst Hobas USA and Flowtite and "to restrain competition by competing GRP Pipe technologies."[25]

This lawsuit commenced with Flowtite seeking declaratory judgment. Now, USCPS has filed counterclaims against Flowtite, alleging Flowtite violated: (1) Section 2 of the Sherman Act, (2) Section 7 of the Clayton Act, and (3) materially breached the License Agreement.[26] The Court now turns to Flowtite's Motion to Dismiss these counterclaims.

## II.  LAW AND ANALYSIS

### A.  Rule 12(b)(6)

When deciding a Rule 12(b)(6) motion to dismiss, "[t]he 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"[27] The Court may consider "the complaint, its proper attachments, 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'"[28] "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"[29]

In *Twombly*, the United States Supreme Court set forth the basic criteria necessary for a complaint to survive a Rule 12(b)(6) motion to dismiss. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his 'entitlement to relief' requires more than

---

[25] *Id.* at p. 17.
[26] Rec. Doc. No. 52.
[27] *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin v. Eby Constr. Co. v. Dallas Area Rapid Transit,* 369 F.3d 464, 467 (5th Cir. 2004)).
[28] *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (quoting *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008)).
[29] *In re Katrina Canal Breaches Litigation*, 495 F.3d at 205 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (hereinafter "Twombly").

labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."[30] A complaint is also insufficient if it merely "tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"[31] However, "[a] claim has facial plausibility when the plaintiff pleads the factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[32] In order to satisfy the plausibility standard, the plaintiff must show "more than a sheer possibility that the defendant has acted unlawfully."[33] "Furthermore, while the court must accept well-pleaded facts as true, it will not 'strain to find inferences favorable to the plaintiff.'"[34] "[O]n a motion to dismiss, courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"[35]

### B. Antitrust Standing

Flowtite moves to dismiss the counterclaims which allege violations under Section 2 of the Sherman Act and Section 7 of the Clayton Act (the "antitrust claims") arguing, in part, that USCPS lacks proper standing. A plaintiff must have standing to pursue an antitrust suit. Specifically, a plaintiff must plead (1) injury-in-fact—meaning an injury proximately caused by the defendant's conduct; (2) antitrust injury; and (3) proper plaintiff status, "'which assures that other parties are not better situated to bring suit.'"[36] Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful. The injury should reflect the

---

[30] *Twombly*, 550 U.S. at 555 (internal citations and brackets omitted).
[31] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).
[32] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570).
[33] *Id.*
[34] *Taha v. William Marsh Rice Univ.*, 2012 WL 1576099 at *2 (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)).
[35] *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286, (1986)).
[36] *Waggoner v. Denbury Onshore, L.L.C.*, 612 F. App'x 734, 736 (5th Cir. 2015) (quoting *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.*, 123 F.3d 301, 305 (5th Cir. 1997)).

anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation."[37] "Typically, parties with antitrust injury are either competitors, purchasers, or consumers in the relevant market."[38] The "proper plaintiff" inquiry examines "(1) whether the plaintiff's injuries or their causal link to the defendant are speculative, (2) whether other parties have been more directly harmed, and (3) whether allowing this plaintiff to sue would risk multiple lawsuits, duplicative recoveries, or complex damage apportionment."[39] "In determining antitrust standing, the Court assumes the existence of an antitrust violation."[40]

Flowtite points to *Norris v. The Hearst Trust*, in which the Fifth Circuit considered an appeal on a monopolization claim brought forth by distributors against a newspaper company. The plaintiffs brought suit because their distribution contracts with the defendant were terminated following the defendant's acquisition of a competing newspaper. The lower court found that the distributors lacked antitrust standing because they were not direct competitors or consumers of the newspaper's products and failed to allege an antitrust-specific injury. The Fifth Circuit affirmed the lower court's holding, stating, "[p]laintiffs are neither consumers (buyers of advertising, or users of advertising such as subscribers) nor competitors (sellers of advertising) in the relevant market. Plaintiffs have not suffered antirust injury."[41]

USCPS argues that Flowtite's reliance on this Fifth Circuit ruling is misplaced. However, based on USCPS' pleadings, the Court rejects this contention. USCPS states

---

[37] *Id*. at 737 (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)).
[38] *Id*.
[39] *Norris v. Hearst Tr.*, 500 F.3d 454, 465 (5th Cir. 2007).
[40] *City of Baton Rouge/E. Baton Rouge Par. v. Bank of Am., N.A.,* 2021 WL 1201665, *3 (M.D. La. Mar. 30, 2021) (citing *Harry v. Total Gas & Power N. Am., Inc.,* 889 F.3d 104, 115 (2d Cir. 2018)).
[41] *Norris*, 500 F.3d at 466.

in its Opposition that it is a "direct competitor of [Flowtite] and its sister company, Hobas USA, as a result of the 2017 Merger."[42] Additionally, USCPS claims it is a "purchaser of [Flowtite] products."[43] However, this runs contrary to the allegations plead in USCPS' Amended Counterclaim Complaint. In its Amended Complaint, while USCPS does allege Hobas USA has been its primary competitor for the last 15 years, USCPS does not allege that Flowtite was ever its competitor. Rather, USCPS alleges that Flowtite develops the technology and USCPS manufactures the GRP pipes with this Flowtite Technology.[44] USCPS states, "[b]efore the 2017 merger. . . USCPS was a licensee, distributor, and customer of [Flowtite] promoting the Flowtite brand [and] building market share in the United States. . . ."[45] But, while asserting it is still a "purchaser" in its Opposition, the allegations in the Amended Complaint state that USCPS "purchas[es] Flowtite Products from other licensees abroad for distribution into the United States."[46] Therefore, USCPS has failed to plead facts to show that it is a current consumer or purchaser of Flowtite. USCPS' purchases are not within the relevant market, as it alleges that the relevant market is the United States.[47] USCPS also alleges that, "[a]fter the 2017 merger. . . USCPS became a direct competitor of Ambilu Holding, [Flowtite's] parent. . . ."[48] Thus, the Amended Complaint contains facts alleging that USCPS was and still is a direct competitor of Hobas USA and Ambilu Holdings. However, USCPS has failed to plead facts which allege that it is a direct competitor or consumer of Flowtite. As such, *Norris* squarely applies.

---

[42] Rec. Doc. No. 57, p. 27.
[43] *Id*.
[44] Rec. Doc. No. 52, p. 2.
[45] Rec. Doc. No. 52, p. 1, 15.
[46] *Id*. at p. 15.
[47] *Id*. at p. 23.
[48] *Id*. at p. 15.

Similar to the plaintiffs in *Norris*, USCPS faces a standing issue. Other circuits have also addressed this standing issue among distributors and suppliers who brought forth antitrust claims.

For example, in *Fischer v. NWA, Inc.*, Fischer, an airline company, had an exclusive agreement with Northwest Airlines, Inc. ("Northwest") to provide regional connecting flight services for Northwest. In 1987, Northwest acquired Republic Airlines, Inc. ("Republic"). Simmons Airlines, Inc. ("Simmons") provided connecting flight services for Republic. Subsequently, Northwest sent a notice of termination to Fischer. Fischer then sued alleging antitrust claims under Section 2 of the Sherman Act.[49] The Eighth Circuit affirmed the lower court's dismissal finding that Fischer failed to establish that it suffered an antitrust injury. The Court explained:

> Fischer [was not] a competitor injured by Northwest's acquisition of monopoly power (roughly 75% of the Detroit market). Rather, Fischer asserts that it suffered damage when it was terminated as Northwest's exclusive regional carrier in Detroit. We conclude that Fischer's termination was not caused by anticompetitive conduct or an anticompetitive effect of such conduct. . . .[50]

The Eighth Circuit further explained that, "Northwest did not act in an anticompetitive manner when it chose to exercise that termination power. Indeed, Northwest's termination power was in no way enhanced by the acquisition of Republic or any anticompetitive effects it may have engendered."[51]

Similarly, in *John Lenore & Co. v. Olympia Brewing Co.*, the Tenth Circuit found that a distributor did not have standing to bring suit against a manufacturer-supplier who

---

[49] *Fischer v. NWA, Inc.*, 883 F.2d 594 (8th Cir. 1989).
[50] *Id*. at 600.
[51] *Id*.

terminated its distributorship agreement.[52] John Lenore & Company ("John Lenore") was a distributor of Hamm's Brewing Company ("Hamm's"). Olympia Brewing Company ("Olympia") eventually acquired some of Hamm's assets. Olympia continued to manufacture and distribute both Hamm's and Olympia's beer and used Hamm's previous distributors. However, Olympia decided to terminate its agreement with these distributors, including John Lenore. Following this, John Lenore brought an antitrust suit. The Court explained that while John Lenore did suffer an injury, the termination of the agreement was not directly and proximately caused by the challenged acquisition. The Court explained that the plaintiff's injury "may have. . . occurred 'by reason of' the unlawful acquisitions, it did not occur 'by reason of' that which made the acquisitions unlawful."[53] Moreover, the Court concluded that the plaintiff was not "within that class of persons whom Congress intended to protect by [Section] 7."[54]

One decision in *SAS of Puerto Rico, Inc. v. Puerto Rico Telephone Co* is also applicable here.[55] SAS of Puerto Rico ("SAS") was a corporation in the business of installing, servicing, and upgrading pay phone equipment. Puerto Rico Telephone Company ("PRTC") provided telephone service in Puerto Rico and was acquired by the Puerto Rico Telephone Authority (the "Authority"). The Authority also created a subsidiary, Telefonica Larga Distancia ("TLD"), for providing long distance carrier services. A couple years later, SAS and PRTC entered into an agreement to provide and maintain pay telephones in Puerto Rico. Under the agreement, SAS acted as the telephone company's agent, and SAS could negotiate with tourist and business centers

---

[52] *John Lenore & Co. v. Olympia Brewing Co.,* 550 F.2d 495 (9th Cir. 1977).
[53] *Id.* at 500 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977)).
[54] *Id*.
[55] *SAS of Puerto Rico, Inc. v. Puerto Rico Tel. Co*., 48 F.3d 39 (1st Cir. 1995).

who held the telephone company's pay phones on their premises. SAS also expected to negotiate with long distance call carriers, whereby SAS could "secure the most favorable terms for the position of pre-assigned long distance carrier at the pay phone."[56]

Ten days after executing this agreement, the Authority entered into an agreement with Telefonica de Espana ("TDE") to sell control of TLD. At the time, TLD was the pre-designated long distance carrier at most of Puerto Rico's pay phones. The plaintiff alleged that following the Authority's selling of TLD, PRTC "engaged in a course of conduct designed to delay, disrupt, and derail" the installations to be carried out by SAS by failing to carry out some of their obligations under the parties' agreement.

The plaintiff then brought suit alleging that these acts constituted attempted monopolization and conspiracy to restrain trade. The lower court dismissed the plaintiff's antitrust claims for lack of antitrust injury. The First Circuit affirmed the lower court's ruling and explained that the plaintiff's injury did not stem from an antitrust violation but rather stemmed from the alleged breach by PRTC to use the plaintiff as a supplier, and that even if the breach was an antitrust violation, the "anticompetitive threat posed" was "to other potential plaintiffs, not SAS."[57] Moreover, the First Circuit explained that even if PRTC's conduct harmed or threatened to harm competition the "'proper' plaintiff [was] a customer who obtains services in the threatened market or a competitor who seeks to serve that market."[58]

---

[56] *Id*. at 42.
[57] *Id*. at 44.
[58] *Id*. (citing *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 538–539 (1983).

Applying *Norris* and considering the persuasive authority among other circuits, the Court finds that USCPS lacks antitrust standing to bring suit against Flowtite because it fails to show antitrust injury, and the "proper" plaintiff factors weigh against standing.

USCPS alleges that Flowtite, the developer of Flowtite Technology and now subsidiary of Ambilu Holdings, breached the License Agreement with USCPS and terminated its exclusive agreement in an effort "to increase the already market-dominant position of Hobas USA."[59] This assertion is in reality alleging that USCPS is injured by way of the joint venture because Hobas USA could replace USCPS as a distributor for the Flowtite Technology, or in other words, Ambilu Holdings would control the developers, manufactures, and suppliers of the GRP Pipe in the United States. These allegations necessitate consideration of the activity of Flowtite's corporate affiliates and parent company, Hobas USA and Ambilu Holdings, neither of which are parties to this action.

Flowtite argues that other district courts have held that a corporation cannot "be held liable under § 2 [of the Sherman Act] for the anticompetitive conduct of one or more related entities, merely by virtue of its place in the same corporate family."[60] In one case, the court wrote, "a plaintiff seeking to show that legally distinct but related companies make up a single economic enterprise under antitrust law must establish that the companies' corporate relationship is such that they 'have a complete unity of interest', and 'that each defendant independently participated in the enterprise's anticompetitive scheme.'"[61] Flowtite argues that USCPS does not plead any factual allegations to show that Flowtite's attempt to assert its rights under the License Agreement was "dictated by

---

[59] Rec. Doc. No. 57, pp. 10-11.
[60] Rec. Doc. No. 56-1, p. 17 (citing *In re Lantus Direct Purchaser Antitrust Litigation*, 2021 WL 8016913, at *4 (D. Mass. June 11, 2021).
[61] *In re Lantus Direct Purchaser Antitrust Litigation*, 2021 WL 8016913, at *4 (internal citations omitted).

or coordinated with its corporate affiliates" and Flowtite and USCPS are the only parties subject to the License Agreement.[62] As such, Flowtite requests that the Court consider Flowtite's conduct alone when addressing the Section 2 claims.[63]

While Flowtite cites cases that are not binding on this Court, USCPS fails to refute Flowtite's arguments on this point, and the Court finds these arguments persuasive. As such, addressing Flowtite's conduct alone, USCPS alleges Flowtite made attempts to terminate the License Agreement and restricted access of the Know-How from USCPS in breach of the Agreement. A contractual breach on its own does not make an antitrust injury. On these facts, Plaintiff has failed to show standing. Accordingly, the motion to dismiss will be granted with respect to USCPS' claims under Section 2 of the Sherman Act.

Applying the rest of this standing test to the remaining Section 7 claims, the Court finds that the "proper plaintiff" factors do not weigh in favor of standing.[64] First, as mentioned, USCPS is a distributor and supplier for Flowtite pursuant to their License Agreement; it is not competing with Flowtite, or a customer of Flowtite's products in the United States. Even if Flowtite's conduct harmed or threatened to harm competition, a customer, such as the contractors who use GRP pipes in their projects, would be more directly harmed by Flowtite's actions.[65] For example, if a contractor used USCPS as a supplier, Flowtite terminating the Agreement provides these contractors with less options for GRP Pipe suppliers. Second, allowing USCPS to sue on these claims would risk

---

[62] Rec. Doc. No. 56-1, p. 18.
[63] *Id.*
[64] Even if the Court was not persuaded by Flowtite's argument to limit the analysis to Flowtite's actions, the Court finds that the "proper plaintiff" factors do not weigh in favor of standing on the Sherman Act Section 2 claims for similar reasons as explained above with respect to the Clayton Act Section 7 claims.
[65] *See e.g., Hughes v. Tobacco Inst., Inc.,* 278 F.3d 417, 423 (5th Cir. 2001) (finding the fact that the plaintiffs were not direct purchasers of defendant weighed "heavily against finding antitrust standing").

multiple lawsuits and duplicative recoveries. Again, USCPS alleges contractors who complete infrastructure projects across the nation have historically decided between USCPS or Hobas USA as their supplier of GRP pipes.[66] Taking these allegations as true, there is a risk that those individuals could also seek recovery against Flowtite, or potentially its corporate affiliates who facilitated the merger. Those individuals appear better situated to bring suit.

Furthermore, after a review of the parties' supplemental briefs and the sources discussed therein, the Court finds these sources do not overcome USCPS' standing issue. USCPS sought leave to file supplemental briefs to discuss a recent Fifth Circuit decision, *Illumina, Inc. v. Federal Trade Commission* and the 2023 Merger Guidelines issued by the Federal Trade Commission.[67] USCPS argues that this Fifth Circuit decision is probative because it represents the first time the Circuit has applied the "ability-and-incentivize" standard to evaluate a Section 7 claim, and the case shows that these types of claims require a fact-specific inquiry.[68] This standard "asks whether the merged firm will have both the ability and the incentive to foreclose its rivals, either from sources of supply or from distribution outlets."[69] However, the Court does not find this decision persuasive in resolving USCPS' standing issue. First, USCPS' arguments for applying *Illumina*, again require the Court to consider the actions of Flowtite's non-party corporate affiliates and parent-company, but USCPS cites no authority to refute Flowtite's request that the Court not consider such actions. For example, USCPS writes:

---

[66] *See e.g*, *id*. (citing *Illinois Brick Co. v. Illinois*, in which the Supreme Court "limited antitrust standing to plaintiffs who purchased directly from the antitrust violators" 431 U.S. 720, 729–735 (1977)).
[67] Rec. Doc. No. 61, pp. 2-3.
[68] *Id*.
[69] *Illumina, Inc. v. Fed. Trade Comm'n*, 88 F.4th 1036, 1051 (5th Cir. 2023).

> USCPS alleges specific facts showing that [Flowtite] and its corporate parent already have exerted the ***ability*** to foreclose rivals in other markets and will have the same ability in the United States. In other markets, [Flowtite]'s parent already has combined the Flowtite Technology and Hobas Technology under common control to dominate supply of GRP Pipe. Here, [Flowtite] has the ***ability*** to repeat the same strategy by blocking USCPS access to the Flowtite Know-How and clawing back from USCPS the only United States license for Flowtite Technology.[70]

The first two points concern Ambilu Holdings' actions on its own or in conjunction with Flowtite, but Ambilu Holdings is not a party in this matter, and USCPS has not persuaded the Court that it should consider Ambilu Holdings' actions when making a decision on Flowtite's actions. The last point, referring to only Flowtite's actions, is an attempt to contrive an antitrust injury from Flowtite's alleged breach and/or termination of the License Agreement. But as the Court stated earlier, a contractual breach does not make an antitrust injury.

With respect to the Merger Guidelines, the Court agrees with USCPS that these guidelines can be "highly persuasive" to a court.[71] But, the authority that USCPS cites also states that "Merger Guidelines are not binding on the courts. . . ."[72] The standing test laid out by the Fifth Circuit, however, is binding on this Court. The Court cannot find that the Merger Guidelines can overcome the shortfalls in USCPS' ability to show standing. Accordingly, the Court will grant the motion to dismiss with respect to USCPS' claims under Section 7 of the Clayton Act.

---

[70] Rec. Doc. No. 66, p. 4.
[71] *Id.* at p. 5 (citing *Chicago Bridge & Iron Co. N.V. v. F.T.C.*, 534 F.3d 410, 434 n.13 (5th Cir. 2008).
[72] *Chicago Bridge & Iron Co.,* at 434 n.13.

## C. Breach of Contract

USCPS also brings forth a breach of contract claim alleging Flowtite breached the License Agreement between it and USCPS. The License Agreement includes a choice of law provision stating that Texas law applies. Under Louisiana choice of law principles, a choice of law provision in a contract is presumed valid and must be given effect unless there is statutory or jurisprudential law to the contrary or public policy warrants reformation.[73] Absent objection by either party and discerning no independent basis for objection, the Court concludes that Texas law controls.

"Under Texas law, the elements of a breach of contract claim are: '1) the existence of a valid contract; 2) performance or tendered performance by the plaintiff; 3) breach of the contract by the defendant; and 4) damages to the plaintiff resulting from the breach.'"[74]

Flowtite moves to dismiss on the assertion that USCPS has failed to plead facts that allege the last three elements of its breach of contract claim.

### 1. Performance or tendered performance by the plaintiff

"In Texas, performance or tendered performance by the plaintiff is an essential element of a breach of contract claim."[75] "'[A] party to a contract who is [itself] in default cannot maintain a suit for its breach.'"[76]

The Court finds that USCPS has sufficiently plead facts for the first element of its breach of contract claim. USCPS alleges that it has complied with the License Agreement

---

[73] *Barnett v. American Const. Hoist, Inc.*, 2011-1261, p. 5 (La. App. 1 Cir. 2/10/12) 91 So.3d 345, 349 (citing La. Civ. Code Ann. art. 3540).
[74] *Varsity Spirit LLC v. Varsity Tutors, LLC*, 2021 WL 9893514, at *7 (N.D. Tex. Sept. 17, 2021) (citing *Lee v. Tyco Elecs. Power Sys., Inc.*, 393 F.Supp.2d 429, 434 (N.D. Tex. 2005)).
[75] *Id*. (*Golden v. Wells Fargo Bank, N.A.,* 557 Fed. Appx. 323, 327 (5th Cir. 2014) (per curiam) (citing *Mullins v. TestAm., Inc.*, 564 F.3d 386, 418 (5th Cir. 2009)).
[76] *Id*. (citing *Dobbins v. Redden*, 785 S.W.2d 377, 378 (Tex. 1990)).

by paying Flowtite quarterly royalty payments as required by the Agreement.[77] However, Flowtite contends it has not received any royalty payments from USCPS since 2020.[78] Notwithstanding this, at this stage of the litigation, the Court will accept USCPS' pleaded facts as true, and its claim will not be dismissed on these grounds.

### 2. Breach of contract by the defendant

"To prevail in a breach of contract claim, a plaintiff must [also] show that the defendant failed to perform an act that it expressly or impliedly promised to perform."[79] USCPS asserts that Flowtite breached the License Agreement by (1) restricting USCPS from accessing the Know-How and (2) attempting to unilaterally terminate the Agreement.

> The section of License Agreement at issue states as follows:
>
> [Flowtite] shall promptly disclose and convey to [USCPS] all the Know-How which has been developed or acquired by [Flowtite] and which it develops or acquires during the Period of Royalty Payments in connection with the Products, which are commercially proven and are applicable to [USCPS's] operations; use its commercially reasonable best efforts to train [USCPS's] employees on producing the Products; and assist [USCPS] to program its computers, modify its facility and operations to produce Product. This includes, [Flowtite] (at [USCPS's] expense for coach travel and reasonable accommodation costs) making its personnel available for training that [USCPS] reasonably determines to be necessary to establish its initial quality controls and production capabilities, and thereafter as needed for new product applications or facility modifications. The Know-How shall be available to [USCPS] in the form of documentation and training, in the English language, and using metric units of measurements.[80]

In construing a contract under Texas law, courts must "ascertain and give effect to the parties' intentions as expressed in the writing itself."[81] Dismissal is inappropriate when a

---

[77] Rec. Doc. No. 52, p. 19.
[78] Rec. Doc. No. 56-1, p. 28.
[79] *Varsity Spirit LLC,* 2021 WL 9893514, at *9 (citing *Berry v. Fed. Nat'l Mortg. Ass'n*, 2013 WL 1294008, at *4 (N.D. Tex. Mar. 29, 2013)).
[80] Rec. Doc. No. 24-1, p. 29.
[81] *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 805 (Tex. 2012) (citation omitted).

contract is ambiguous. "A contract is not ambiguous if it can be given a definite or certain legal meaning as a matter of law."[82] But "if the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, which creates a fact issue on the parties' intent."[83]

USCPS argues that Flowtite has breached its obligation to "promptly disclose and convey. . . all the Know-How" because instead of Flowtite providing USCPS with complete, physical copies of all the Know-How, it provided USCPS with only some of the Know-How through a "restricted online software."[84] Further, USCPS alleges that Flowtite initially performed its obligation by providing the Know-How in "physical computer disc copies."[85] Flowtite argues that the current delivery of the Know-How was not in breach of the License Agreement because USCPS' access to the Know-How via a secured server is "conveyance" as required by the Agreement.[86] The Court finds that both parties have presented reasonable interpretations for the meaning of "promptly disclose and convey", and as such, the contract is ambiguous. Therefore, dismissal is inappropriate on these grounds. Given that USCPS has sufficiently plead facts to allege breach, there is no need for the Court to address USCPS' second form of alleged breach at this time.

### 3. Damages

To recover on a breach of contract claim, "the evidence must show that the damages are the 'natural, probable, and foreseeable' consequence of the defendant's conduct."[87]

---

[82] *King v. Baylor Univ.*, 46 F.4th 344, 362 (5th Cir. 2022) (citation omitted); *See also Coker v. Coker*, 650 S.W.2d 391, 393–94 (Tex.1983).
[83] *King,* 46 F. 4th at 362.
[84] Rec. Doc. No. 57, p. 29.
[85] Rec. Doc. No. 52, p. 10.
[86] Rec. Doc. No. 56-1, pp. 28–29.
[87] *IAS Servs. Grp., L.L.C. v. Jim Buckley & Assocs., Inc.*, 900 F.3d 640, 652 (5th Cir. 2018) (citing *Velvet Snout, LLC v. Sharp*, 441 S.W.3d 448, 451 (Tex. App.—El Paso 2014, no pet.).

"[A] party may not recover damages for breach of contract if those damages are remote, contingent, speculative, or conjectural."[88] USCPS alleges its damages are: (1) loss of competitive advantage; (2) loss of the exclusive rights to the Know-How; (3) loss of trade secrets; and (4) loss of potential profits.[89]

Flowtite argues that USCPS does not allege facts shown in the form loss actually sustained as required under Texas law.[90] The Court agrees with Flowtite that this showing is a requirement under Texas law; thus, USCPS cannot rely on its alleged facts asserting "loss of potential profit" because it is remote and speculative.[91] Turning to the three other alleged forms of damage, the Court finds USCPS has sufficiently plead facts as to damages suffered. While the Court finds these allegations lack specification, at this stage of the litigation, the Court can plausibly infer losing a competitive advantage, its exclusive rights, and access to trade secrets hinders USCPS' ability to act as a supplier in the GRP Pipe market. As USCPS is in the market for this particular purpose, the level of detail in these allegations survives a 12(b)(6) motion. Accordingly, Flowtite's motion is denied on the breach of contract claim.

---

[88] *CQ, Inc. v. TXU Min. Co.,* L.P., 565 F.3d 268, 278 (5th Cir. 2009) (citing *City of Dallas v. Villages of Forest Hills, L.P., Phase I*, 931 S.W.2d 601, 605 (Tex. App.—Dallas 1996, no writ).
[89] Rec. Doc. No. 52, p. 21.
[90] Rec. Doc. No. 56-1, p. 30.
[91] *See CQ, Inc.*, 565 F.3d 268 at 278 ("Under Texas law, contract damages are defined by the plaintiff's actual loss: The universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage *actually sustained*.").

### III. CONCLUSION

The Court finds that USCPS has sufficiently plead facts only as to Count I of its Amended Counterclaim Complaint.[92] Accordingly, Flowtite's Motion[93] is hereby **GRANTED in part** and **DENIED in part**. Counts II and III are dismissed with prejudice. Additionally, Flowtite's *Motion to Dismiss*[94] USCPS' Counterclaim[95] is **DENIED AS MOOT** considering this *Ruling* on the Amended Counterclaim Complaint.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana, on this ___7th___ Day, March, 2024.

_____
**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

---

[92] Rec. Doc. No. 52.
[93] Rec. Doc. No. 56.
[94] Rec. Doc. No. 45.
[95] Rec. Doc. No. 37.