**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

AMIBLU TECHNOLOGY AS

VERSUS

U.S. COMPOSITE PIPE SOUTH, LLC

CIVIL ACTION

22-259-SDD-RLB

**RULING**

The present matter came before the Court for a bench trial on July 28 through July 29, 2025. The Court has considered the parties' pre-trial and post-trial submissions, the evidence admitted at trial, and the arguments presented, and rules as follows.

## I.    BACKGROUND

This case arises from a contractual dispute. Plaintiff, Amiblu Technology AS f/k/a Flowtite Technology AS ("Amiblu"), initiated this action seeking declaratory relief in connection with a Know-How and Intellectual Property License Agreement (the "License Agreement") between Amiblu and Defendant, U.S. Composite Pipe South, LLC ("USCPS").[1] USCPS filed a Counterclaim against Amiblu alleging that Amiblu breached the License Agreement.[2] Both parties filed motions for partial summary judgment.[3] After disposition of those motions,[4] the remaining matters for trial included Amiblu's claim for termination of the License Agreement for failure of consideration and USCPS's Counterclaim for Amiblu's breach of the License Agreement.

---

[1] Rec. Doc. 15.
[2] Rec. Doc. 52.
[3] Rec. Docs. 78, 81.
[4] *See* Rec. Doc. 159.

## II.    FINDINGS OF FACT

The following facts are either established by stipulation or supported by credible evidence in the record. Where a particular fact was controverted, the Court weighed the evidence and evaluated the credibility of the witnesses in making its finding.

### A.    The Parties and Related Entities

1.    Amiblu is a Norwegian company with its principal place of business in Norway.[5]

2.    USCPS is a Louisiana limited liability company.[6]

3.    Thompson Pipe Group, Inc. ("TPG") is the parent company of USCPS. TPG is a family of companies, one of which also includes Thompson Pipe Group Pressure, Inc. ("TPG Pressure").[7]

### B.    Witnesses and Evidentiary Matters

4.    The following witnesses testified at trial:

a.    Alex Heaton: served as the Plant Manager of USCPS's facility in Zachary, Louisiana, and is currently a Senior Project Manager of Fiberglass-Reinforced Polymer ("FRP") Products for TPG.[8]

b.    Behzad Basiri: President of Strategic Products for TPG.[9]

c.    Tomas Andersson: Managing Director of Amiblu, serves as the Chief Operating Officer.[10]

d.    Zvonimir Kovac: Chief Financial Officer for the TPG companies, which include USCPS.[11]

---

[5] Rec. Doc. 125, p. 11, ¶ 3. Prior to 2018, Amiblu was called Flowtite Technology AS.
[6] *Id.* at p. 11, ¶ 1.
[7] 7/29/2025 Testimony of Zvonimir Kovac at 98:2-99:5.
[8] 7/28/2025 Testimony of Alex Heaton at 55:2-59:13.
[9] 7/28/2025 Testimony of Behzad Basiri at 128:12-134:15.
[10] 7/29/2025 Testimony of Tomas Andersson at 3:15-8:12.
[11] 7/29/2025 Testimony of Zvonimir Kovac at 96:5-20.

5.  The parties additionally offered the testimony of multiple witnesses by deposition:[12]

    a.  Tomas Andersson appeared as a fact witness at trial and was available for examination by both parties. Therefore, the Court finds that his prior fact deposition testimony submitted as Def. Exh. 091-A, B, and C is duplicative and unnecessary, and hereby sustains Amiblu's objection to its admissibility in whole.

    b.  Ken Thompson, CEO of USCPS and TPG companies, testified by deposition on June 11, 2024, both individually and on behalf of USCPS. Both USCPS and Amiblu seek to designate portions of the depositions. Under Federal Rule of Civil Procedure 32, "[a] party may use for any purpose the deposition of a witness … if the court finds … that the witness is more than 100 miles from the place of hearing or trial or is outside the United States, unless it appears that the witness's absence was procured by the party offering the deposition[.]"[13] USCPS points out that Thompson lives more than 100 miles away from this Court. Amiblu argues that USCPS "procured" Thompson's absence at trial such that USCPS should be prohibited from designating any of the deposition testimony for trial purposes. Amiblu essentially argues that USCPS had complete control over Thompson and should have ensured his presence at trial. However, the Court finds that Thompson's status as CEO without more

---

[12] The parties submitted objections to numerous deposition excerpts based on relevance, vagueness, foundation, mischaracterization of prior testimony, form, and other such matters. Rec. Doc. 222-1. The Court considered the objections. Rather than rule on such objections in isolation, the Court will disregard any deposition testimony that it determines to be inadmissible in any of these respects.
[13] Fed. R. Civ. P. 32(a)(4)(B).

does not show that USCPS procured his absence.[14] Therefore, the Court will allow both parties' designations of Thompson's deposition testimony, subject to the objections lodged as to particular excerpts.

c. Roy Morten Standahl testified by deposition on June 20, 2024. Standahl is a Process Engineer at Amiblu and oversees the organization and provision of Know-How to licensees, including USCPS.[15]

d. Detlev Schlorke testified by deposition on June 25, 2024. Schlorke was originally with Amitech USA before the transaction at issue, joined USCPS, oversaw operations and manufacturing out of the Louisiana facility, and eventually became President of TPG Pressure before his employment ended.[16]

e. Morten Hotvedt testified by deposition on July 1, 2024. Hotvedt is a Process Technician at Amiblu who provides onsite technical support to licensees worldwide, including USCPS.[17]

f. Jorge Medina testified by deposition on June 28, 2024. Medina began working for USCPS in 2012 as an engineering manager and later worked for TPG Pressure in the same role.[18]

---

[14] *See In re Taxotere (Docetaxel) Prods. Liab. Litig.*, No. 16-17039, 2021 WL 6202422, at *3 n.10 (E.D. La. July 26, 2021) (the fact that the unavailable witness was the defendant's corporate representative was not enough to support a finding that the defendant procured the witness's absence under Rule 32).
[15] Def. Exh. 93-A, Deposition of Roy Morten Standahl at 48:20-23, 50:7-11, 68:10-69:1.
[16] Pla. Exh. 95-4 (SEALED), Deposition of Detlev Schlorke at 10:14-16, 11:8-15, 12:6-14:3, 17:9-16, 18:13-19:4, 20:20-25, 22:18-22.
[17] Def. Exh. 94-A, Deposition of Morten Hotvedt at 12:22-14:4, 26:9-24.
[18] Pla. Exh. 85-3, Deposition of Jorge Medina at 30:15-19, 31:8-14.

### C. FRP

6. Fiberglass-reinforced polymer pipe ("FRP") is a combination of resin, sand, and fiberglass, along with chemical additives.[19] It is designed to be long-lasting and anti-corrosive, and has applications in water and wastewater.[20]

7. Amiblu, previously known as Flowtite, has at all relevant times been the registered owner of certain patents, intellectual property, know-how, and trade secrets related to a certain process (the "Flowtite Process") of manufacturing FRP as well as the trademark(s) associated with the "Flowtite" brand (the "Flowtite Mark").[21]

### D. The Sale of Assets Agreement and the License Agreement

8. On December 14, 2007, a "Sale of Assets Agreement" was executed by three companies: Amitech USA, LLC ("Amitech"), Saudi Arabian Amiantit Company ("Amiantit"), and KTI, Inc. ("KTI").[22] At the time the Sale of Assets Agreement was executed, Amitech and Amiblu (then known as Flowtite) were subsidiaries of Amiantit.[23] KTI was USCPS's predecessor, and the Sale of Assets Agreement was ultimately amended to replace KTI with USCPS as party to the agreement.[24]

9. In the years leading up to 2007, Amitech was manufacturing and selling FRP under a license from Flowtite (prior to the name-change to Amiblu).[25]

10. In the Sale of Assets Agreement, USCPS agrees to purchase "substantially all of the assets, properties, and business of Amitech USA, including without limitation, the real

---

[19] 7/28/2025 Testimony of Alex Heaton at 69:3-6; 7/29/2025 Testimony of Tomas Andersson at 48:24-49:5.
[20] 7/28/2025 Testimony of Alex Heaton at 59:14-21.
[21] Rec. Doc. 125, p. 11, ¶ 5.
[22] *Id.* at p. 11, ¶ 6.
[23] *Id.* at p. 11, ¶ 8; Rec. Doc. 24-1, p. 3 (SEALED).
[24] Rec. Doc. 24, p. 1 (SEALED). To minimize confusion, the Court will refer to USCPS rather than KTI when discussing the Sale of Assets Agreement.
[25] 7/29/2025 Testimony of Tomas Andersson at 15:9-11, 15:19-16:2.

property and its improvements, tools, tooling, equipment, vehicles, inventory, trade names Flowtite and Meyer Polycrete polymer, formulas, processes and related trade secrets[.]"[26]

11. The Sale of Assets Agreement includes USCPS's purchase of a facility in which to manufacture FRP in Zachary, Louisiana (the "Zachary Plant").[27] It also includes the "license rights in trade names, trademarks, service marks, Flowtite and Meyer Polycrete polymer and Intellectual Property Rights (as defined herein), processes, formulas and trade secrets used by Amitech USA."[28]

12. Of the total purchase price of $14 million, the Sale of Assets Agreement allocates $1 million to "Intellectual Property Rights, Trade Secrets, etc."[29]

13. Amiantit and Amitech expressly covenant in the Sale of Assets Agreement to "cause or direct its affiliates to sign" certain "Intellectual Property Agreements," unexecuted copies of which were attached as exhibits to the Sale of Assets Agreement.[30]

14. One of the attached "Intellectual Property Agreements" was a "Know-How and Intellectual Property License Agreement" between Flowtite and "KTI, Inc. (or its assigned under its sale of assets agreement with Amitech [] and [] Amiantit [])."[31] The latter party was ultimately replaced with USCPS when the final form of the agreement (hereinafter referred to as the "License Agreement") was executed.

---

[26] Rec. Doc. 24-1, p. 1 (SEALED).
[27] *Id.*
[28] *Id.*
[29] *Id.* at p. 2.
[30] *Id.* at p. 13.
[31] *Id.* at p. 63.

15. The closing of the Sale of Assets Agreement was conditioned upon execution of the License Agreement between (then-named) Flowtite and USCPS.[32]

16. The Sale of Assets Agreement is fully incorporated by reference into the License Agreement.[33]

17. On January 20, 2008, USCPS and Amiblu entered into the License Agreement.[34]

18. Through the License Agreement, Amiblu grants USCPS, "for an unlimited duration," an "exclusive" license of the Flowtite Process to "manufacture, have made, use and sell" FRP.[35]

19. In return, the License Agreement requires USCPS to pay royalties (2.5% of net sales) to Amiblu on all "Products manufactured by USCP[S] as a result of th[e License] Agreement" for an identified "Period of Royalty Payments."[36]

20. The Period of Royalty Payments specified in the License Agreement runs through March 1, 2012, after which USCPS has three consecutive renewal options to "extend the term of this Agreement" for five years "upon written notice of exercise of such option at least ninety (90) days prior to the expiration of the term, or extended term, hereof."[37]

21. The License Agreement also grants USCPS the following additional rights: 1) authorization of USCPS to state on its products that it is manufacturing "under license from [Flowtite]" and to use "the relevant Trademarks and Copyrights of [Flowtite]," and 2) the right to receive any new additional Know-How related to the Flowtite Process

---

[32] *Id.* at p. 17. *See also* Rec. Docs. 78-8 & 83-1, ¶ 6. The Court will hereinafter refer to the company Flowtite by its current name, Amiblu.
[33] Rec. Doc. 1-4, p. 17 (SEALED).
[34] *Id.* at p. 1.
[35] *Id.* at p. 3.
[36] *Id.* at p. 4.
[37] *Id.*

"developed or acquired" by Amiblu during the Period of Royalty Payments, which Amiblu has the duty to "promptly disclose and convey."[38] These rights are hereinafter referred to as the "Auxiliary Rights."

22. According to the terms of the License Agreement, the Auxiliary Rights apply "during the Period of Royalty Payments."[39] Thus, the Auxiliary Rights are coterminous with the Period of Royalty Payments.

23. Unlike the Auxiliary Rights, the exclusive license granted to USCPS in the License Agreement is for an "unlimited duration," i.e., perpetual, and is not coterminous with the Period of Royalty Payments. This was the subject of USCPS's Motion for Partial Summary Judgment, which the Court granted.[40]

24. USCPS exercised its renewal option in March of 2012, and again in 2017.[41]

25. On December 8, 2021, before the end of the 2017–2022 Period of Royalty Payments, Amiblu, through Tomas Andersson, instructed the Managing Director of Amiblu France's West Region (including Quebec, Canada) to be careful not to remind USCPS to renew the Period of Royalty Payments.[42]

26. USCPS failed to renew before the expiration of the most recent term, which ended on March 1, 2022.[43]

27. The Auxiliary Rights ended on March 1, 2022, due to USCPS's failure to submit a timely notice of renewal.[44] Therefore, the last day of USCPS's entitlement to receive

---

[38] *Id.* at pp. 3–4.
[39] *Id.*
[40] *See* Rec. Doc. 159, pp. 1–28.
[41] USCPS's attempt to renew in 2017 was disputed by Amiblu, but litigation on this topic was ultimately settled. *See* Def. Exh. 13; 7/29/2025 Testimony of Tomas Andersson at 34:18-35:1; Pla. Exh. 87-4, USCPS 30(b)(6) Deposition through Ken Thompson at 39:13-24.
[42] Def. Exh. 22 (SEALED); 7/29/2025 Testimony of Tomas Andersson at 67:18-68:17, 69:15-75:1.
[43] Rec. Docs. 81-1 & 101-1 (SEALED), ¶¶ 3–4. *See also* Rec. Doc. 159, p. 46.
[44] Rec. Doc. 159, p. 51.

newly developed or acquired Know-How from Amiblu, and the last day of USCPS's obligation to pay royalties to Amiblu, was March 1, 2022.

28. The expiration of the Auxiliary Rights did not affect USCPS's unlimited-duration, exclusive license of the Flowtite Process.[45]

### E. USCPS's Manufacturing Operations, Payment of Royalties to Amiblu, and Access to Know-How

29. After the closing of the Sale of Assets Agreement and the execution of the License Agreement, USCPS manufactured FRP at the Zachary Plant using the Flowtite Process.[46]

30. The Flowtite Process for manufacturing FRP involves the use of a continuously advancing mandrel process, also referred to as "continuous filament winding."[47]

31. Continuous filament wound FRP is manufactured on a device called a winder, which spins, or winds, materials to create certain specified diameters of pipe based on specifications provided through an attached computer.[48]

32. As mentioned above, the License Agreement requires that Amiblu "promptly disclose and convey to [USCPS] all the Know-How which has been developed or acquired by [Amiblu] and which it develops or acquires during the Period of Royalty Payments in connection with the Products, which are commercially proven and are applicable to [USCPS's] operations[.]"[49]

---

[45] *See* Rec. Doc. 159.
[46] Pla. Exh. 87-4, USCPS 30(b)(6) Deposition through Ken Thompson at 25:5-19. FRP manufactured through the Flowtite Process will hereinafter be referred to as "Flowtite FRP."
[47] Rec. Doc. 1-4, p. 1 (SEALED); *see also* 7/28/2025 Testimony of Alex Heaton at 64:11-73:24.
[48] *Id.*
[49] Rec. Doc. 1-4, p. 3 (SEALED).

33. The License Agreement defines "Know-How" as "all technical knowledge and data, processes, techniques, drawings and designs, unpatented inventions, operating manuals, manufacturing and quality control procedures, trade secrets, plans, accumulated experience and other know-how of any kind relating to the design, manufacture, application, of the Products developed or obtained by [Amiblu] or to the maintenance, operation and turning of the machinery used by USCP[S]."[50]

34. Each winder has an embedded software control system that contains "recipes" and "setups" from the Know-How, which allow winder operators to dial in the necessary specifications including variations in diameter and pressure to produce pipe.[51]

35. These recipes are always accessible as long as there is a valid license in place, and each winder's computers are remotely connected to Amiblu's Norway operation where the licenses are periodically verified.[52]

36. Other items of Know-How include: user manuals; a fittings[53] interface which includes a cost estimation tool; "Flo-Calc," which is a tool that uses underlying data to generate outputs necessary to manufacture FRP; and "Ami-Tool," which interrogates underlying data to provide users with outputs, best practices, guidance, and prescriptions.[54]

---

[50] *Id.* at p. 2.
[51] 7/29/2025 Testimony of Tomas Andersson at 19:7-21:4.
[52] *Id.* at 21:5-18.
[53] In addition to straight pipe, USCPS also manufactured fittings, which connect sections of straight pipe. Fittings will be discussed in additional detail *infra.*
[54] 7/29/2025 Testimony of Tomas Andersson at 17:24-20:12, 21:19-22:4, 22:22-24:3, 25:8-26:8, 27:5-18, 28:14-33:20; Def. Exh. 93-A, Deposition of Roy Morten Standahl at 136:18-137:13, 142:6-143:10, 149:24-150:13, 154:16-19, 160:2-161:1, 169:6-24.

37. Amiblu initially made Flowtite Know-How available to licensees via CD-ROM. But around 2008, Amiblu ceased providing Know-How via CD-ROM and instead made the Know-How available via a password-protected online portal.[55]

38. This portal has been the exclusive method of conveyance for the Know-How used by all Flowtite Licensees worldwide since approximately 2008 or 2009.[56]

39. Flowtite licensees such as USCPS can gain access to the portal for specific employees by requesting they be issued a username and password.[57]

40. Behzad Basiri, testifying as a corporate representative of USCPS, testified that he could not identify any portal access issues prior to March 1, 2022 (the expiration date of the Auxiliary Rights), that were not due to "technical difficulties where the portal was down or there was an Internet connectivity issue."[58] He agreed that no such issues were directed at USCPS in particular but were simply temporary technical downtime issues.[59]

41. Neither could Detlev Schlorke, former General Manager of the Zacharay Plant for USCPS, recall "any issues with access to the portal while [he] was with [USCPS]" prior to the expiration of the Auxiliary Rights.[60]

---

[55] 7/29/2025 Testimony of Tomas Andersson at 21:20-22:21; Pla. Exh. 095-4 (SEALED), Deposition of Detlev Schlorke at 39:15-22.

[56] Def. Exh. 93-A, Deposition of Roy Morten Standahl at 116:3-19; 7/29/2025 Testimony of Tomas Andersson at 22:15-21.

[57] 7/28/2025 Testimony of Alex Heaton at 96:22-97:5; 7/29/2025 Testimony of Tomas Andersson at 23:2-7.

[58] Pla. Exh. 90-2, USCPS 30(b)(6) Deposition through Behzad Basiri at 24:3-7.

[59] *Id*; 7/28/2025 Testimony of Behzad Basiri at 221:18-225:5.

[60] Pla. Exh. 95-4 (SEALED), Deposition of Detlev Schlorke at 40:20-41:1. *See also* 7/28/2025 Testimony of Alex Heaton at 99:18-100:7.

42. The online portal on which Know-How currently resides allows USCPS to view, but not download, certain Know-How, including "flipping books" that contain "hard-core technology" like the Flowtite Know-How manuals and product sheets.[61]

43. The online portal allowed USCPS to use a Manufacturer Specifications Tool—which generates calculated outputs that explain how to manufacture a specific fitting in response to a user's inputs by relying on underlying design data—but the portal does not allow users to access or download the underlying data necessary to generate the fitting designs by running the calculations themselves.[62]

44. The online portal allowed USCPS to use a Cost Estimation Tool—which generates calculated outputs that assist in the estimation of costs associated with fitting fabrication based on the user's inputs relating to the specific FRP Pipe at issue—but users were not allowed to create outputs for cataloging and retention, and the portal does not allow users to access or download the underlying data necessary to generate the outputs themselves.[63]

45. The online portal allows USCPS to use Flo-Calc—which generates calculated outputs necessary to run a winder to produce Flowtite pipe according to each job's specific application—but the portal does not allow users to access or download the underlying data necessary to run FloCalc (or the winder) themselves.[64]

46. The online portal allows USCPS to use Ami-Tool—which interrogates tables of underlying data to provide a calculated pipe design output to users according to that

---

[61] Def. Exh. 93-A, Deposition of Roy Morten Standahl at 136:18-137:13, 149:24-150:3, 150:6-13.
[62] *Id.* at 142:6-143:10.
[63] 7/29/2025 Testimony of Tomas Andersson at 27:5-10; 7/28/2025 Testimony of Alex Heaton at 86:12-87:19, 91:19-92:6; 7/28/2025 Testimony of Behzad Basiri at 153:11-15.
[64] Def. Exh. 93-A, Deposition of Roy Morten Standahl at 154:16-19, 169:6-24, 172:15-173:1.

job's specific application—but the portal does not allow users to access or download the underlying data tables necessary to run the calculations themselves.[65]

47. While manufacturing Flowtite products, USCPS at least once attempted to create its own local copy of a portion of the Know-How—from the Cost Estimation Tool—by providing inputs to the portal and downloading the calculated outputs for various sizes and specifications of Flowtite FRP. Amiblu directed USCPS to stop downloading these portions of the Know-How, and USCPS complied.[66]

48. Without access to the Know-How, USCPS cannot manufacture Flowtite FRP or fittings.[67]

49. In addition to manufacturing, Know-How is also required for other aspects of USCPS's operations under its Flowtite license, including pre-bid activities, bidding, submittal, post-award coordination with engineers, pipe installation, and servicing pipe that has already been installed.[68]

50. Amiblu tracks improvements to the Know-How and maintains records that show when changes were made to the Know-How, such that it can tell what the state of the technology was at any given time in the past.[69]

51. USCPS's manufacturing operations continued at the Zachary Plant until the plant was shut down in 2019.[70]

---

[65] *Id.* at 60:2-161:1.
[66] 7/28/2025 Testimony of Alex Heaton at 86:9-87:19.
[67] *Id.* at 64:3-72:21, 85:15-20, 115:4-8 125:4-126:1, 127:10-11; Def. Exh. 93-A, Deposition of Roy Morten Standahl at 154:16-19, 169:6-24, 172:15-173:1; 7/29/2025 Testimony of Tomas Andersson at 23:2-24:3, 25:14-26:8.
[68] 7/28/2025 Testimony of Behzad Basiri at 152:10-155:14; 7/28/2025 Testimony of Alex Heaton at 91:19-92:18, 127:4-20.
[69] 7/29/2025 Testimony of Tomas Andersson at 33:22-34:17.
[70] Pla. Exh. 87-4, USCPS 30(b)(6) Deposition through Ken Thompson at 25:17-19.

52. In mid-2019, USCPS began shipping equipment from the Zachary Plant with the intention of reopening a Flowtite FRP manufacturing facility in Alvarado, Texas.[71]

53. Since the dismantling of the Zachary Plant in 2019, USCPS has ceased to produce Flowtite FRP.[72]

54. In total, USCPS paid Amiblu $3,479,710 in royalties between 2008 and 2020.[73]

55. USCPS made its last royalty payment to Amiblu in January of 2020, which covered royalties generated by USCPS in Quarter 4 of 2019.[74]

56. Between the Sale of Assets Agreement and continued general expenditures and losses, USCPS invested about $81 million in its Flowtite-related operations from 2008 through 2023.[75]

57. The only winder ever in operation at the Zachary Plant could only produce Flowtite FRP up to 2,400 millimeters in diameter.[76]

58. In addition to the 2,400-millimeter winder that was in operation at the Zachary Plant, USCPS also purchased a second winder from Goa, India which, if refurbished and assembled, would be able to produce Flowtite FRP up to 3,000 millimeters in size (the "Goa Winder").[77]

---

[71] 7/28/2025 Testimony of Alex Heaton at 57:19-58:3, 80:24-83:10; 7/28/2025 Testimony of Behzad Basiri at 131:9-17, 167:17-168:4, 179:13-15, 231:4-18; *see also* 7/29/2025 Testimony of Tomas Andersson at 91:22-92:15; 7/29/2025 Testimony of Zvonimir Kovac at 110:14-23.

[72] Ex. Pla-087-4, USCPS's 30(b)(6) Deposition through Ken Thompson at 26:6-11.

[73] Def. Exh. 18 (SEALED); 7/29/2025 Testimony of Zvonimir Kovac at 106:8-107:5.

[74] *Id.*

[75] 7/29/2025 Testimony of Zvonimir Kovac at 113:23-114:2

[76] 7/28/2025 Testimony of Alex Heaton at 81:15-82:4.

[77] Pla. Exh. 95-4 (SEALED), Deposition of Detlev Schlorke at 81:22-82:3; 7/28/2025 Testimony of Alex Heaton at 82:1-4.

59. Despite relocating the previously intact 2,400-millimeter winder and the dismantled Goa Winder to Alvarado, Texas, USCPS has still not set up either machine and has never restarted production of Flowtite FRP at any of their facilities.[78]

60. USCPS still intends to set up Flowtite FRP production in Alvarado, although it has no current "timeline" to do so.[79]

### F. The Sales Agency Agreement

61. On April 1, 2019, USCPS entered into a Sales Agency Agreement with TPG Pressure, Inc. ("TPG Pressure").[80]

62. The Sales Agency Agreement designates TPG Pressure as "the primary sales agent" for USCPS of "FRP type pipe products."[81] It also allows TPG Pressure at its discretion to "undertake manufacturing processes to fulfill Product orders."[82] The Sales Agency Agreement further provides that USCPS is in no way prevented "from manufacturing and selling products as it deems necessary and appropriate provided that such actions shall not directly compete with any job that [TPG Pressure] is currently engaged in bidding or providing material."[83]

63. The License Agreement states: "This Agreement may not be assigned by USCP[S] to any other party, except to a company formed or funded by the owners of KTI, Inc., without the express written consent of [Amiblu], which consent will not be unreasonably withheld."[84]

---

[78] 7/28/2025 Testimony of Alex Heaton at 117:3-12.
[79] Pla. Exh. 90-2, USCPS 30(b)(6) Deposition through Behzad Basiri at 15:13-16:15; 7/28/2025 Testimony of Behzad Basiri at 167:22-168:4, 179:13-15.
[80] Pla. Exh. 63 (SEALED).
[81] *Id.* at p. 1.
[82] *Id.*
[83] *Id.* at p. 2.
[84] Rec. Doc. 1-4, p. 9 (SEALED).

64. TPG Pressure was formed/funded by the owners of KTI, Inc.[85]

65. After entering into the Sales Agency Agreement, USCPS paid $94,471.16 in royalties to Amiblu, as a result of $3,778,846 in Net Sales generated by products manufactured by USCPS under the License Agreement in the last three quarters of 2019.[86]

### G. USCPS's Import Model

66. Under the terms of the License Agreement, USCPS's license includes the "sole and exclusive right to … import … any products … which incorporate or otherwise utilize any Licensed Property[.]"[87]

67. During USCPS's transition of FRP production from Zachary, Louisiana, to Alvarado, Texas, USCPS shifted to an "import model" whereby it fulfilled FRP orders by purchasing pipe from three companies: O-tek Columbia, O-tek Mexico, and Subor.[88]

68. The import model was intended to be a stop-gap measure during the transition from Zachary to Alvarado.[89]

69. During the early stages of the import model, USCPS purchased primarily from O-tek, which was a Flowtite licensee at the time.[90]

70. Eventually, around 2021 or 2022, USCPS stopped purchasing from O-tek and began purchasing from Subor.[91]

71. Subor was a Flowtite licensee until in or around 2019, when its license expired.[92]

---

[85] 7/29/2025 Testimony of Zvonimir Kovac at 98:2-99:5.
[86] Def. Exh. 18 (SEALED); 7/29/2025 Testimony of Zvonimir Kovac at 106:8-107:5.
[87] Rec. Doc. 1-4, p. 3 (SEALED).
[88] Def. Exh. 39 (SEALED); 7/29/2025 Testimony of Zvonimir Kovac at 107:11-109:1.
[89] 7/28/2025 Testimony of Behzad Basiri at 167:22-168:4.
[90] 7/28/2025 Testimony of Alex Heaton at 84:20-85:2.
[91] *Id.* at 84:20-24.
[92] Pla. Exh. 90-2, USCPS 30(b)(6) Deposition through Behzad Basiri at 37:22-25.

72. When Subor manufactures pipe for USCPS's commonly-owned assignee TPG Pressure, they do not label it as Subor pipe. Instead, each Subor pipe sold is affixed with the stenciled label of "TPG-FRP" or similar.[93]

73. TPG Pressure is now the exclusive distributor of Subor pipe in North America.[94]

74. When importing rather than manufacturing pipe, USCPS still engages in activity which requires Know-How, including pre-bid activities, bidding, submittal, pipe installation, and post-installation servicing.[95]

### H. Fittings

75. Fittings are used to connect sections of straight pipe to create elbows, tees, and other types of joints.[96]

76. USCPS used to manufacture fittings at the Zachary Plant prior to its closure in 2019.[97]

77. Fittings are included in the definition of "Products" under the License Agreement for which royalties are owed to Amiblu.[98]

78. Fittings are made by converting pieces of straight pipe into the desired product (e.g., a flange or an elbow).[99]

79. USCPS has manufactured fittings since the closure of the Zachary plant in 2019.[100]

80. If USCPS needed to make fittings for a project where it imported pipe, USCPS would use the pipe it purchased and imported to fabricate the fittings.[101]

---

[93] 7/28/2025 Testimony of Alex Heaton at 121:4-9; 7/28/2025 Testimony of Behzad Basiri at 172:17-173:20, 184:9-17, 194:20-195:18; Pla. Exh. 90-2, USCPS 30(b)(6) Deposition through Behzad Basiri at 37:11-21.
[94] Pla. Exh. 74-2 (SEALED); 7/28/2025 Testimony of Behzad Basiri at 202:4-9.
[95] 7/28/2025 Testimony of Behzad Basiri at 152:10-155:14.
[96] 7/28/2025 Testimony of Alex Heaton at 89:8-18.
[97] *Id.* at 114:12-23.
[98] Rec. Doc. 1-4, p. 1 (SEALED).
[99] Pla. Exh. 89-2 (SEALED), USCPS 30(b)(6) Deposition through Alex Heaton at 11:11-12:6.
[100] 7/28/2025 Testimony of Alex Heaton at 114:14-23; Pla. Exh. 86-6 (SEALED), Deposition of Ken Thompson at 76:22-78:1.
[101] 7/28/2025 Testimony of Alex Heaton at 91:13–18.

81. USCPS uses Flowtite Know-How when it manufactures Flowtite fittings, and the labor and materials required are marked up with a margin such that they generate positive net sales of domestically manufactured Flowtite fittings.[102]

82. USCPS made its last royalty payment to Amiblu in January of 2020, which covered royalties generated by USCPS in Quarter 4 of 2019.[103]

### I.   Restrictions to Know-How Access

83. Amiblu is able to restrict and cut off USCPS's access to the Know-How.[104]

84. When the Period of Royalty Payments expired in March of 2022 due to USCPS's failure to submit a timely renewal, Amiblu took the position that USCPS was no longer entitled to any Know-How or technical support from Amiblu.[105]

85. In March of 2022, Amiblu restricted USCPS's access to the Know-How such that USCPS did not initially have access to any Know-How for a period of time. Now, USCPS lacks access to certain items of Know-How, including at least some aspects of the fittings interface and any Know-How relating to FRP larger than 2,400 millimeters.[106]

### III.   CONCLUSIONS OF LAW

### A.  Applicable Law

86. Texas substantive law applies to this diversity case pursuant to a choice of law provision in the License Agreement.[107]

---

[102] *Id.* at 89:19-20; Pla. Exh. 87-4, USCPS 30(b)(6) Deposition through Ken Thompson at 26:22-27:8.
[103] Def. Exh. 18 (SEALED); 7/29/2025 Testimony of Zvonimir Kovac at 106:8-107:5.
[104] 7/29/2025 Testimony of Tomas Andersson at 75:7-80:10.
[105] *Id.*; *see also* Def. Exh. 25 (SEALED).
[106] 7/29/2025 Testimony of Tomas Andersson at 26:9-25, 27:11-24, 75:7-80:10.
[107] Rec. Doc. 1-4, p. 9 (SEALED).

## B. Failure of Consideration and "Best Efforts"

87. "Failure of consideration occurs when, due to a supervening cause after an agreement is reached, the promised performance fails[.]"[108]

88. Amiblu argues the License Agreement should be rescinded for failure of consideration because USCPS stopped manufacturing Flowtite FRP, thereby halting the generation of royalty payments, in 2019. Amiblu also argues that USPCS's importation and sale of Subor pipe when Subor no longer held a Flowtite license impermissibly deprived Amiblu of royalties.[109]

89. The License Agreement does not expressly obligate USCPS to manufacture a certain amount of Flowtite FRP or to generate a certain amount of royalty payments.[110]

90. Amiblu argues the Court should impose an implied obligation on USCPS to use "best efforts" to generate royalties.[111]

91. The Court finds that there is no implied obligation in this case for USCPS to use "best efforts" to generate royalties.[112] There is case law supporting the concept that, where the *sole* consideration provided in exchange for an exclusive license is the payment

---

[108] *Belew v. Rector*, 202 S.W.3d 849, 854 n.4 (Tex. App. 2006) (internal citations omitted).

[109] Rec. Doc. 224, pp. 20–22.

[110] *See generally* Rec. Doc. 1-4 (SEALED); *see also* Rec. Doc. 159, pp. 50–51 ("the License Agreement does not obligate USCPS to sell a certain amount of pipe.").

[111] Rec. Doc. 224, pp. 20–22.

[112] This conclusion renders irrelevant any discussion of Amiblu's relationship with Hobas U.S.A., Inc. ("Hobas"). Amiblu filed a Motion *in Limine* seeking exclusion of any evidence regarding its relationship or dealings with Hobas. Rec. Doc. 131. In opposing the Motion *in Limine*, USCPS argued that evidence regarding Hobas would be relevant to showing that USCPS satisfied its ostensible obligation of best efforts, to the extent that such an obligation applied. Rec. Doc. 154. The Court denied the Motion *in Limine* but reserved Amiblu's objections for trial. Rec. Doc. 192, pp. 9–10. Because the Court has rejected the best efforts theory as a matter of law, the Court finds that Amiblu's relationship with Hobas is irrelevant.

of royalties or is otherwise linked to the generation of revenue by the licensee, an obligation to use best efforts should be impliedly imposed on the licensee.[113]

92. However, the Court finds that the $1 million paid by USCPS under the Sale of Assets Agreement for "Intellectual Property Rights, Trade Secrets, etc." included consideration for the Flowtite license. In Texas, "[w]hen a document is incorporated into another by reference, both instruments must be read and construed together."[114] As the Texas Supreme Court has explained,

> Texas courts have long recognized that, under appropriate circumstances, "instruments pertaining to the same transaction may be read together to ascertain the parties' intent, even if the parties executed the instruments at different times and the instruments do not expressly refer to each other." Where appropriate, "a court may determine, as a matter of law," that multiple separate contracts, documents, and agreements "were part of a single, unified instrument." In determining whether multiple agreements are part and parcel of a unified instrument, a court may consider whether each written agreement and instrument was "a necessary part of the same transaction." But when construing multiple documents together, courts must do so with caution, bearing in mind that tethering documents to each other is "simply a device for ascertaining and giving effect to the intention of the parties and cannot be applied arbitrarily and without regard to the realities of the situation."[115]

93. The Sale of Assets Agreement was fully incorporated by reference into the License Agreement. Further, the execution of the License Agreement was a condition precedent and express covenant of the Sale of Assets Agreement. As the Court found

---

[113] *See Insiders Edge, Inc. v. Institutional Rsch. Servs., Inc.*, No. 3:94-CV-0088-R, 2004 WL 2203246, at *12 (N.D. Tex. Sept. 30, 2004) (applying New York precedent); *Permanence Corp. v. Kennametal, Inc.*, 908 F.2d 98, 100 (6th Cir. 1990).

[114] *King v. Baylor Univ.*, 46 F.4th 344, 359 (5th Cir. 2022) (quoting *In re C & H News Co.*, 133 S.W.3d 642, 645-46 (Tex. App.—Corpus Christi-Edinburg 2003, no pet.) (citation omitted).

[115] *Rieder v. Woods*, 603 S.W.3d 86, 94–95 (Tex. 2020) (quoting *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000); *Bd. of Ins. Comm'rs v. Great S. Life Ins. Co.*, 150 Tex. 258, 239 S.W.2d 803, 809 (1951); *Miles v. Martin*, 159 Tex. 336, 321 S.W.2d 62, 65 (1959)).

in its summary judgment Ruling, "the grant of the license through the License Agreement was ancillary to the purchase through the [Sale of Assets Agreement]. The License Agreement was one part of a bigger overall transaction."[116] In other words, "the grant of the license through the License Agreement was one necessary piece of the overall transaction that the parties intended."[117]

94. Construing the Sale of Assets Agreement and the License Agreement together, the Court finds that both the initial payment for intellectual property rights through the Sale of Assets Agreement as well as the payment of royalties under the License Agreement constitute consideration for USCPS's license.

95. Moreover, the Texas Supreme Court has emphatically rejected a theory "that in every contract there is an implied covenant that neither party will do anything which injures the right of the other party to receive the benefits of the agreement."[118] The court explained that such an implied requirement of "good faith and fair dealing" "would abolish our system of government according to settled rules of law and let each case be decided upon what might seem 'fair and in good faith,' by each fact finder."[119] The Court finds this reasoning applicable to the implied "best efforts" obligation for which Amiblu advocates here.

96. Therefore, Amiblu's request for rescission of the License Agreement due to USCPS's stopping of manufacturing operations, as well as its import and sale of Subor pipe, is

---

[116] Rec. Doc. 159, p. 22.
[117] *Id.* at p. 44.
[118] *English v. Fischer*, 660 S.W.2d 521, 522 (Tex. 1983).
[119] *Id.*

rejected because the law does not impose an obligation of "best efforts" under these circumstances.[120]

### C. USCPS's Counterclaim for Breach of Contract

#### 1. The Counterclaim

97. USCPS argues that Amiblu breached its duty to "promptly disclose and convey" Know-How developed or acquired during the Period of Royalty Payments. More specifically, USCPS argues that Amiblu's use of the online portal breached the duty to "convey" the Know-How because "USCPS was not able to download or retain copies of the Know-How while the Know-How was hosted on the online portal[.]"[121]

98. Under Texas law, "contracts should be read as a whole, with terms given their plain, ordinary, and generally accepted meaning, and with each term given effect so as not to render recitations meaningless or mere surplusage."[122]

99. Dictionary definitions of "convey" include: "to bear from one place to another," and "to transfer or deliver (something, such as property or property rights) to another especially by a writing (such as a deed or will)."[123]

100. The Court finds that the online portal was not in and of itself a breach of the contractual obligation to "convey." The Court does not find the testimony of USCPS personnel about the purported "arduousness" of accessing information on the portal

---

[120] To the extent Amiblu contends that USCPS's importation and sale of Subor pipe was a direct breach of the terms of the License Agreement, *see* Rec. Doc. 224, pp. 13–15, the Court rejects the argument. The License Agreement expressly allows USCPS to import products that "utilize[] any Licensed Property." Rec. Doc. 1-4, p. 3. But it does not expressly disallow USCPS's import of other products, and the Court finds that the License Agreement does not otherwise impose exclusivity on USCPS in the way that Amiblu suggests.

[121] Rec. Doc. 222, p. 29.

[122] *Strebel v. Wimberly*, 371 S.W.3d 267, 277 (Tex. App. 2012) (citing *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005)).

[123] *Convey*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/convey (last visited March 26, 2026).

convincing.[124] The evidence reflects that USCPS had no significant interruptions in its operations from 2008–2022, during which time the online portal was in use.

101.    However, the Court does find that USCPS's rights were violated when Amiblu cut off USCPS's access to the Know-How. USCPS has a perpetual license to the Flowtite Process. The evidence shows that in order to fully exercise that license, USCPS needs the Know-How.

102.    The expiration of the Period of Royalty Payments ended Amiblu's obligation to continue to provide USCPS with newly developed or acquired Know-How. However, the Court finds no evidence that the License Agreement contemplates Amiblu's revocation of Know-How as it was known at the end of the Period of Royalty Payments which it had already provided to USCPS, which holds a license of unlimited duration.

103.    The Court agrees with USCPS that the use of the word "convey" is most naturally understood to mean that USCPS is able to continue to access the Know-How beyond the Period of Royalty Payments so that it can have the ability to exercise its perpetual license. This conclusion is supported by the testimony from both Amiblu and USCPS witnesses who testified that the Know-How is required for USCPS to meaningfully exercise its license of the Flowtite Process.

104.    The License Agreement requires Amiblu to disclose and convey Know-How that is "applicable to [USCPS's] operations." Amiblu argues that the Know-How is no longer "applicable to USCPS's operations" because "USCPS's operations no longer include the manufacture of Flowtite Pipe and did not at the time the Auxiliary Rights expired."[125] However, the evidence shows that Know-How is needed for aspects of

---

[124] 7/28/2025 Testimony of Alex Heaton at 85:21-86:5, 96:22-97:24.
[125] Rec. Doc. 224, p. 29.

USCPS's operations other than manufacturing. Further, the testimony indicates that USCPS still intends to manufacture Flowtite FRP at its Alvarado, Texas facility. And to do so, USCPS needs to have the Know-How. Therefore, the Court concludes that the Know-How remains "applicable to USCPS's operations."

105.   USCPS seeks specific performance "requiring Amiblu to convey a complete copy of the Know-How as of the last day of the Period of Royalty Payments" (March 1, 2022).[126]

106.   "Under Texas law, specific performance is an equitable remedy that is normally available only when the complaining party cannot be fully compensated through the legal remedy of damages or when damages may not be accurately ascertained."[127] It "is not a separate cause of action, but rather it is an equitable remedy used as a substitute for monetary damages when such damages would not be adequate."[128] The remedy of specific performance is "committed to the trial court's discretion."[129]

107.   Specific performance may be appropriate where property has a "special, peculiar, or unique value or character."[130]

108.   The Court finds that the facts of this case support USCPS's request for specific performance. The Know-How is of special, peculiar, or unique value or character. The Know-How consists of formulas and information that cannot be replicated by USCPS. USCPS cannot effectively bid, manufacture, offer for sale, repair, or service pipes without ready access to the Know-How.

---

[126] Rec. Doc. 222, p. 33.
[127] *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 153 (5th Cir. 2004).
[128] *Stafford v. S. Vanity Mag., Inc.*, 231 S.W.3d 530, 535 (Tex. App. 2007) (citations omitted).
[129] *Id.*
[130] *Id.* (quoting *Madariaga v. Morris,* 639 S.W.2d 709, 711 (Tex.App.-Tyler 1982, writ ref'd n.r.e.)).

109.   The evidence is somewhat unclear regarding the precise aspects of the Know-How to which USCPS currently lacks access. To the extent that the online portal or parts thereof is still available to USCPS as a Flowtite licensee, Amiblu is not in breach of its obligations as to that information. As the holder of a perpetual license, USCPS is entitled to perpetual access to the information on the portal as it existed on or later than March 1, 2022.

110.   However, the evidence shows that USCPS's access to at least some of the Know-How has been hindered or revoked, including at least some aspects of the fittings interface as well as all information relating to FRP larger than 2,400 millimeters.

111.   Whether it be through the portal or some other medium, Amiblu must restore USCPS's access to the components of the Know-How to which it currently lacks access. USCPS is entitled to the version of the Know-How as it existed on or later than March 1, 2022.

### 2. Amiblu's Affirmative Defenses to the Counterclaim

112.   The elements of a breach of contract action under Texas law are: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach."[131]

113.   As to the second element, a "plaintiff must allege [its] own performance, because 'a party to a contract who is [itself] in default cannot maintain a suit for its breach.'"[132] "[I]t is a fundamental principle of contract law that when one party to a contract

---

[131] *Certain Underwriters at Lloyd's of London v. Lowen Valley View, L.L.C.*, 892 F.3d 167 (5th Cir. 2018) (citation omitted).

[132] *Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 767 (5th Cir. 2016) (quoting *Dobbins v. Redden*, 785 S.W.2d 377, 378 (Tex. 1990)).

commits a material breach of that contract, the other party is discharged or excused from further performance."[133]

114.    "By contrast, when a party commits a nonmaterial breach, the other party 'is not excused from future performance but may sue for the damages caused by the breach.'"[134]

115.    Materiality is generally "determined by the trier of facts."[135]

116.    Factors that are significant in determining whether a material breach has occurred include: "(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of the circumstances including any reasonable assurances; (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing."[136]

117.    Amiblu alleges that USCPS materially breached the License Agreement in three ways such that USCPS's request for specific performance should be rejected: 1) USCPS failed to use best efforts to generate royalties; 2) USCPS failed to pay

---

[133] *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) (citing *Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994)).
[134] *Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017) (quoting *Levine v. Steve Scharn Custom Homes, Inc.*, 448 S.W.3d 637, 654 (Tex. App.–Houston [1st Dist.] 2014, pet. denied)).
[135] *Id.* (quoting *Hudson v. Wakefield*, 645 S.W.2d 427, 430 (Tex. 1983)).
[136] *Id.* at 436-437 (Tex. 2017) (citing Restatement (Second) of Contracts § 241 (Am. Law Inst. 1981)).

royalties on fittings; and 3) USCPS improperly assigned its rights through the Sales Agency Agreement.[137]

### a. Best Efforts

118.    For its first affirmative defense, Amiblu purports to rely on the same implied obligation of "best efforts" discussed above in connection with the failure-of-consideration theory. Because the Court has found that no such implied obligation exists in this case, Amiblu's first affirmative defense lacks legal support and will be dismissed.

### b. Royalties on Fittings

119.    Amiblu argues that "USCPS has materially breached the [License Agreement] by failing to report sales of and pay Royalties on domestically manufactured fittings[.]"[138]

120.    More specifically, Amiblu alleges that "USCPS has not paid any royalties derived from the manufacture of Flowtite fittings since 2019[.]"[139]

121.    The evidence shows that at some time after 2019, USCPS manufactured fittings. Further, it is undisputed that USCPS has paid no royalties since 2020. The 2020 payment was for royalties generated in the last quarter of 2019.

122.    However, the evidence lacks sufficient specificity to sustain Amiblu's affirmative defense on this basis. The Period of Royalty Payments ended on March 1, 2022; therefore, USCPS would not have owed royalties to Amiblu on anything manufactured after that date. So, for Amiblu's affirmative defense to have merit, it would need to show specifically that USCPS generated revenue from manufacturing fittings between

---

[137] Rec. Doc. 224, pp. 29–33.
[138] *Id.* at pp. 31–32.
[139] *Id.*

the beginning of 2020 (the last royalty payment) and March 1, 2022. There is no evidence specifically establishing when USCPS was manufacturing fittings.

123.    Additionally, there is no evidence indicating how many fittings may have been produced during the pertinent timeframe, nor how much revenue those fittings may have generated. The testimony reflects that when USCPS made fittings for projects where it imported Flowtite pipe from O-tek, it utilized the imported pipe which it had already purchased from O-tek to construct the fittings. However, USCPS personnel also testified that USCPS included the costs of labor and materials for making those fittings in the bid price, which would result in some amount of sales revenue from the manufacture of the fittings. But Amiblu has presented no quantitative evidence on this issue. With no such information, the Court cannot determine "the extent to which" Amiblu was "deprived of the benefit which [it] reasonably expected," which is a significant factor in determining whether USCPS's alleged failure to pay royalties on fittings between 2020 and March 1, 2022, was "material."[140]

124.    The evidence is also lacking as to other materiality factors. For the second factor, the Court finds that Amiblu can pursue adequate compensation for the alleged unpaid royalties through a direct claim against USCPS to recover those amounts.[141]

125.    Regarding the third factor, "the extent to which the party failing to perform or to offer to perform will suffer forfeiture," the Restatement (Second) of Contracts provides the following explanation:

> [A] failure is less likely to be regarded as material if it occurs late, after substantial preparation or performance, and more likely to be regarded as material if it occurs early, before such

---

[140] *Bartush-Schnitzius Foods Co.*, 518 S.W.3d at 436.
[141] *See* Restatement (Second) of Contracts § 241 ("If the failure is a breach, the injured party always has a claim for damages[.]").

> reliance. For the same reason the failure is more likely to be regarded as material if such preparation or performance as has taken place can be returned to and salvaged by the party failing to perform or tender, and less likely to be regarded as material if it cannot.[142]

Here, USCPS's alleged failure occurred between 2020 and 2022. For more than a decade prior, USCPS undisputedly had been consistently paying significant royalties to Amiblu and making significant expenditures on its Flowtite-related operations. Thus, USCPS's alleged breach occurred late in the pertinent time frame, and its substantial preparation and performance would not be easily salvageable. Accordingly, the Court finds that the third factor weighs against materiality.

126.   For these reasons, the Court finds that Amiblu has not shown that USCPS committed a "material breach" of the License Agreement by allegedly failing to pay royalties on fittings between 2020 and 2022. Therefore, Amiblu was not "excused from further performance" on this basis. To be clear, Amiblu could pursue a claim against USCPS for unpaid royalties.[143] However, based on the evidence presented in this matter, these allegations do not bar USCPS's counterclaim, and the affirmative defense on this basis will be dismissed.

### c. Improper Assignment of Rights

127.   Amiblu argues USCPS's assignment of rights to TPG Pressure through the Sales Agency Agreement constitutes a material breach of the License Agreement.[144]

128.   Article 9.4 of the License Agreement states: "This Agreement may not be assigned by USCP[S] to any other party, except to a company formed or funded by the owners

---

[142] Restatement (Second) of Contracts § 241.
[143] *See Bartush-Schnitzius Foods Co.*, 518 S.W.3d at 436 (quoting *Levine*, 448 S.W.3d at 654).
[144] Rec. Doc. 224, pp. 32–33.

of KTI, Inc., without the express written consent of [Amiblu], which consent will not be unreasonably withheld."[145]

129.   Amiblu argues that the capitalized term "Agreement" refers to the entirety of the License Agreement. Therefore, Amiblu reads Article 9.4 to mean that USCPS is allowed to assign the entire License Agreement, and no less, to an entity such as TPG Pressure which is formed or funded by the owners of KTI; otherwise, USCPS needed the express written consent of Amiblu.[146]

130.   Through the Sales Agency Agreement, USCPS assigned rights to sell and manufacture Flowtite FRP to TPG Pressure, but did not assign the obligation to pay Royalties. Therefore, USCPS did not assign the entire License Agreement, and Amiblu argues USCPS needed its express written consent to enter into the Sales Agency Agreement.

131.   The License Agreement does not explicitly prohibit an assignment of less than all of its rights and obligations. However, assuming *arguendo* that the Sales Agency Agreement constitutes a breach, the Court finds that Amiblu has not proven materiality. Amiblu argues that "[b]y assigning the rights, but not obligations, of the [License] Agreement to TPG Pressure [ ], USCPS deprived Amiblu of its expected benefit under the [License] Agreement by violating Amiblu's right to determine what entity may exercise the exclusive license to produce Flowtite and under what terms."[147] The Court is not persuaded by this argument because Article 9.4 of the License Agreement allows assignment *without the consent of Amiblu* as long as the

[145] Rec. Doc. 1-4, p. 9 (SEALED).
[146] Rec. Doc. 224, pp. 32–33.
[147] *Id.* at p. 33.

assignee is a company formed or funded by the owners of KTI. Thus, even if the entire License Agreement were assigned to a KTI-related company, Amiblu still would not be able to "determine what entity may exercise the exclusive license" because its consent would not be required.

132.    Furthermore, there is no evidence showing what harm, if any, Amiblu sustained due to the Sales Agency Agreement. USCPS made royalty payments to Amiblu after the Sales Agency Agreement was confected. This undermines Amiblu's suggestion that the Sales Agency Agreement was an attempt by USCPS to circumvent its obligation to pay royalties.

133.    Accordingly, Amiblu's affirmative defense on this basis will be dismissed.

### 3. USCPS's Affirmative Defenses

134.    USCPS purports to assert affirmative defenses "to Amiblu's enforcement of the deadline to renew the Period of Royalty Payments," arguing that "Amiblu engaged in conduct that was inequitable and commercially unreasonable by attempting to enforce the deadline."[148]

135.    Two of USCPS's affirmative defenses survived summary judgment: its Fourth Affirmative Defense and its Tenth Affirmative Defense.[149]

136.    In its Fourth Affirmative Defense, USCPS states: "Plaintiff's claim is barred, in whole or part, because [Amiblu] failed to act in a commercially reasonable manner."[150] USCPS asserts that Amiblu breached Article 9.10 of the License Agreement, which

---

[148] Rec. Doc. 222, pp. 45–46.
[149] Rec. Doc. 159, pp. 51–54.
[150] Rec. Doc. 37, p. 13.

requires that the parties "shall use their commercially reasonable best efforts to amicably resolve all disputes without resorting to litigation."[151]

137.    In its Tenth Affirmative Defense, USCPS states: "Plaintiff's claim is barred by the doctrine of unclean hands."[152] Under this doctrine, "a court sitting in equity may refuse to grant relief to a plaintiff who was guilty of inequitable or unlawful conduct with regard to the issue in dispute."[153] "The idea is that equitable relief is not warranted when a plaintiff has engaged in unjust, unconscionable, or inequitable conduct with regard to the issue in dispute."[154]

138.    On summary judgment, the Court noted the undisputed fact that USCPS failed to timely renew the Period of Royalty Payments that expired on March 1, 2022.[155]

139.    USCPS argues that Amiblu has unclean hands and violated Article 9.10 of the License Agreement "[b]y intentionally taking advantage of USCPS's oversight, by planning a months' long strategy for doing so, with anticipation that litigation would result, and without making any attempt to avoid litigation."[156] In support, USCPS points to the email communications where Tomas Andersson told Managing Director of Amiblu France's West Region to be careful not to remind USCPS to renew the Period of Royalty Payments.

140.    The Court rejects both affirmative defenses. Amiblu had no duty to remind USCPS to renew the Period of Royalty Payments. The record reflects that USCPS "simply

---

[151] Rec. Doc. 1-4, p. 10 (SEALED).
[152] Rec. Doc. 37, p. 14.
[153] *Westport Ins. Corp. v. Pennsylvania Nat'l Mut. Cas. Ins. Co.*, 662 F. Supp. 3d 727, 734 (S.D. Tex. 2023) (citation omitted).
[154] *Id.* (citation omitted).
[155] Rec. Doc. 159, p. 45.
[156] Rec. Doc. 222, p. 46.

forgot" to submit a timely renewal notice.[157] USCPS has not submitted sufficient evidence of "unjust, unconscionable, or inequitable conduct" to sustain the unclean hands defense.[158] The Court also finds that Article 9.10 of the License Agreement does not require Amiblu to remind USCPS to meet its own renewal deadline. A timely renewal was USCPS's responsibility.

141.    Accordingly, the Period of Royalty Payments and attendant Auxiliary Rights expired on March 1, 2022. USCPS's affirmative defenses will be dismissed.

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes as follows:

The License Agreement grants USCPS a perpetual license to the Flowtite Process.

The Period of Royalty Payments and the attendant Auxiliary Rights expired on March 1, 2022.

Amiblu's claim for termination of the License Agreement for failure of consideration is DISMISSED WITH PREJUDICE.

USCPS'S Counterclaim for breach of contract and request for specific performance is GRANTED IN PART. Within thirty days of the entry of Judgment, Amiblu is hereby ordered to provide USCPS with full and indefinite access to the Flowtite Know-How. Amiblu is hereby further ordered to indefinitely reinstate USCPS's full access to any components of the Know-How to which USCPS lost access, specifically including but not limited to the fittings interface and Know-How relating to FRP larger than 2,400 millimeters. The Know-How so provided, whether through the online portal or some other medium, shall be in the state it existed as of or later than March 1, 2022. USCPS shall

---

[157] Rec. Doc. 159, p. 45.
[158] *Westport Ins. Corp.*, 662 F. Supp. 3d at 734.

have access to the Know-How as it existed as of or later than March 1, 2022, for as long as it continues to hold a valid license.

Amiblu's affirmative defenses to USCPS's Counterclaim are DISMISSED WITH PREJUDICE.

USCPS's affirmative defenses to Amiblu's enforcement of the deadline to renew the Period of Royalty Payments are DISMISSED WITH PREJUDICE.

The Court reserves any issue of entitlement to attorney's fees, which shall be addressed, if necessary, in conjunction with a timely filed motion for same pursuant to Federal Rules of Civil Procedure 54(d)(2) the Local Rules of this Court.

Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this _30th_ day of _____March_____, 2026.

_____

**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**